IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| William Joshua Alston, | Case No.: 2:23-cv-03252-SAL |
| Plaintiff, | |
| v. | **ORDER** |
| Beth Lawson, et al., | |
| Defendants. | |

William Joshua Alston ("Alston"), proceeding *pro se* and *in forma pauperis*, brings this civil action pursuant to 42 U.S.C. § 1983. Before the court are Alston's motion for partial summary judgment, ECF No. 219, and Defendants'[1] motion for summary judgment, ECF No. 230. Also before the court is Defendants' motion for entry of judgment under Federal Rule of Civil Procedure 54(b), ECF No. 236.

## I.   Background

This case arises from the medical care Alston received as a pretrial detainee between August 2022 and April 2024. His conditions included: an infected gunshot wound on his ankle, a spider bite on his nose, damage to his ear, a suspicious lump on his chest, concerns of skin cancer, general depression, and anxiety. *See generally* ECF Nos. 1, 131. According to Alston, Defendants

---

[1] Defendants are: Dr. Garman, the medical director of the J. Reuben Long Detention Center (the "Detention Center"); Elizabeth Lawson, RN and Health Services Administrator at the Detention Center; Nurse Danielle Winns; Nurse Rachel Brown; Nurse Katrina Krystanowicz; Nurse Danielle Winn; Nurse Jamie Wilson; Nurse Mike Minette; Nurse Jennifer Brown; Nurse Michele Squires; Nurse Melissa McLean; Nurse Practitioner Sally Blake; Nurse Carrie Yost; Nurse Adrian Small; Nurse Shawnette Attaway; Nurse Kelsey Ledford; Nurse Karen Jones; Nurse Practitioner Alex Petkovsek; Nurse Brielle Buis; Nurse David Sieklicki; Nurse Chasidy Queen; and Nurse Practitioner Schinitra Swinney (collectively "Defendants"). [ECF No. 269.]

failed to timely respond to his requests for medical treatment; failed to provide necessary items and medications; improperly subjected him to temporary isolation; and failed to provide necessary referrals to medical specialists, all in violation of his constitutional rights.

United States Magistrate Judge Mary Gordon Baker, pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(4) (D.S.C.), issued a Report and Recommendation ("Report"), recommending Defendants' motion for summary judgment be granted.[2] [ECF No. 269.] Alston objects. [ECF No. 271.]

## II.     Legal Standards

### A.  Review of a Magistrate Judge's Report

The magistrate judge makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with this court. *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). In response to a recommendation, any party may serve and file written objections. *See Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3)). The district court then makes a de novo determination of those portions of the Report to which an objection is made. *Id.* To trigger de novo review, an objecting party must object with sufficient specificity to reasonably alert the district court of the true ground for the objection. *Id.* (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). If a litigant objects only generally, the court need not explain adopting the Report and must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Accident Ins.*, 416 F.3d 310, 315 (4th Cir. 2005) (citing Fed. R. Civ. P. 72 advisory committee's note).

---

[2] Judge Baker also issued a Report and Recommendation on Defendants' motion for entry of judgment under Rule 54(b). [ECF No. 268.] But the court need not reach that motion since it agrees dismissal is warranted under Rule 56(a).

2

An objection is specific so long as it alerts the district court that the litigant believes the magistrate judge erred in recommending dismissal of that claim. *Elijah*, 66 F.4th at 460. Objections need not be novel to be sufficiently specific. *Id.* In the absence of *specific* objections this court is not required to give any explanation for adopting the recommendation. *Field v. McMaster*, 663 F. Supp. 2d 449, 451–52 (D.S.C. 2009). That said, the Fourth Circuit has instructed district courts that *pro se* filings, "however unskillfully pleaded, must be liberally construed." *Noble v. Barnet*, 24 F.3d 582, 587 (4th Cir. 1994).

### B. Summary Judgment

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of proving to the court that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

### III. Analysis

In their motion for summary judgment, Defendants argue Alston's constitutional claims fail as a matter of law. [ECF No. 230-1.][3]

#### A. Deliberate Indifference Standard

Because Alston was a pretrial detainee at the time of the alleged constitutional violations, his deliberate indifference claims are properly brought under the Due Process Clause of the Fourteenth Amendment, which protects the rights of pretrial detainees to receive adequate medical care. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001).

To establish deliberate indifference to a serious medical need, a pretrial detainee must show:

(1) he had a medical condition or injury that posed a substantial risk of serious harm;

(2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed;

(3) the defendant knew or should have known:
   (a) that he had that condition and
   (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and

(4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024).

Under this standard, a plaintiff need not show "that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Id.* Instead, it is sufficient to show that the defendant's action

---

[3] Alston likewise moves for summary judgment against Defendants Lawson, Garman, Swinney, Blake, and Petkovsek. [ECF No. 219-2.]

or inaction was "objectively unreasonable." *Id.* (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

It is not enough to allege a defendant "negligently or accidentally failed to do right by the detainee." *Id.* at 611–12; *see also Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—showing of mere negligence will not meet it."). And differences of opinion between an inmate patient and medical staff over the course of medical treatment are insufficient to state a claim of deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (finding inadequate treatment due to negligence, inadvertence, or differences in judgment between an inmate and the medical personnel does not rise to the level of a constitutional violation). Likewise, "[m]ere delay" in medical treatment, without more, is not deliberate inference to a serious medical need. *Moskos v. Hardee*, 24 F. 4th 289, 298 (4th Cir. 2022).

### B. Basis for § 1983 Claims

In his motion for partial summary judgment, Alston alleges Defendants were deliberately indifferent to his serious medical needs by delaying his medical treatment in the following ways:

- failing to treat his gunshot wound with antibiotics;

- waiting three days to treat his spider bite with antibiotics;

- delaying treatment for his ear and shoulder pain;

- delaying treatment of his mental health issues;

- delaying treatment for his painful skin;

- delaying authorization for his footwear to reduce ankle pain;

- delaying treatment for his ear infections; and

- waiting six days to provide his hearing aid batteries that were readily available.

[ECF No. 219-1; 219-2 at 5–7, 16–18.]

He further claims that Defendants denied him access to medical specialists for financial reasons. [ECF No. 219-2 at 8.] Alston also attempts to assert a supervisory liability claim against these Defendants, as well as a claim based on the "ineffective medical system for communicating and treating." *Id.* at 10–16.

In his response to Defendants' motion for summary judgment, Alston identifies the following additional events as deliberate indifference under § 1983:

- Defendant Minette refused to provide him extra gauze on October 6, 2022;

- Defendant Sielicki denied him access to medical personnel capable of treating his cracked skin on his foot in March 2024;

- Defendant Jennifer Brown refused to substitute his prescribed medication;

- Defendant Winns refused to provide him ibuprofen;

- Defendant Squires refused medicine for pain in his nose from a spider bite;

- Defendant Wilson refused wound care on his bullet wound;

- Defendant Queen failed to document his ear issues;

- Defendant Ledford denied him medicine for the pain due to the "severe infection in his bullet wound" on September 28, 2022, and did not help him with the pain from his spider bite;

- Defendant Rachel Brown refused him medicine for his ear infection;

- Defendant Blake chose to medically isolate him;

- Defendant Lawson deliberately interfered with medical treatment.

[ECF No. 257 at 23–41.]

While not developed in his briefing, Alston's amended complaint appears to assert a § 1983 claim against Nurse Lawson because for making him wait seven days for a new wheelchair. [ECF No. 1 at 45–48.]

6

## IV.    Objections

This matter was referred to a magistrate judge for preliminary administration. After the parties fully briefed the pending motions for summary judgment, the magistrate judge issued a Report recommending summary judgment for Defendants. Alston objects and identifies fourteen grounds that support his argument. [ECF No. 271.] His filing The court addresses these in kind.

### A.  Objection One: Bullet Wound

Alston arrived at the Detention Center on July 21, 2022, with an open gunshot wound to his left ankle, which had been treated at a hospital. [ECF No. 230-2 at 114–18.] Medical staff screened him, noted hospital discharge orders for antibiotics and wound care, cleaned and dressed the wound, and scheduled Alston for a physician follow up. *Id.* Over the following months, Alston met with medical personnel more than a dozen times to address this wound. Alston was also temporarily quarantined, ostensibly to protect him from infection. These visits are meticulously detailed in the Report, ECF No. 269 at 3–13, and are summarized in a table attached to this order. *Supra* app. 1. Alston now claims that he has no feeling in or use of his fourth or fifth toes, nor any feeling along the left side of his foot. [ECF No. 271 at 11.]

The magistrate judge found that Alston's deliberate indifference claim failed because he had not demonstrated a substantial injury due to any delay in care. [ECF No. 269 at 32–33.]

In his objections, Alston recites the treatment history of his gunshot wound and asserts that "[he] has shown deliberate indifference towards his bullet wound. There is no argument to be made upon review of the record and documentation." [ECF No. 271 at 11.] But he relies primarily on out-of-circuit opinions and conclusory statements, without identifying any specific error in the Report. Even liberally construing Alston's objections, the court reaches the same conclusion as the magistrate judge.

7

The record reflects Alston met with medical personnel over twelve times in five months concerning the gunshot wound to his ankle. *See* app. 1. Although he disagrees with the course of treatment he received, Alston has failed to show he suffered substantial harm from any delay or that any Defendant acted in an objectively unreasonable manner regarding his treatment. *See* ECF No. 269 at 33, 35, 51. The record shows that each time Alston was seen for this issue, medical personnel tracked how his wound was healing. They noted when there was improvement, and when there was not, they either prescribed additional treatment or scheduled a consult.[4] *Id.* Those measures were effective. Indeed, the most recent records show the wound was "healing well" with normal color, no warmth, no discharge, no redness, no foul smell and with good granulation tissue covering the entire wound. At most, the court could infer negligence, but mere negligence falls below the constitutional threshold. *Short*, 87 F.4th at 611–12. And again, Alston has also failed to point to any substantial harm. Accordingly, this objection is overruled.[5]

### B. Objections Two, Three, and Four: Ear Pain and Subsequent Infections

---

[4] Alston, citing *Ruffin v. Deperio*, 97 F. Supp. 2d 346 (W.D.N.Y.), asserts that his claims should proceed because his medical treatment for his gunshot wound merely documented his condition and continued ineffective treatment. [ECF No. 271 at 4.] In *Ruffin* the court found a reasonable jury could find treatment to be deliberately indifferent to an inmate's medical needs where "treatment" consisted of "little more than documenting his worsening condition." *Ruffin* 97 F. Supp. 2d at 353. Here, however, Alston's treatment *was* effective. The medical records illustrate that his gunshot wound, while once concerning, was later "healing well" with swelling decreasing "markedly" over time. Thus, *Ruffin* is distinguishable.

[5] Alston mentions that the magistrate judge "did not see" a medical request submitted on October 11, 2022, which demonstrated Lawson's failure to provide solutions for medical concerns. *See* ECF No. 271 at 9. If he is disagreeing with the magistrate judge's factual recitation, the court finds the magistrate judge accurately described the facts as they appear in the record. The cited medical request is one discrete document and was submitted to the magistrate judge for consideration in the current summary judgment motion. [ECF No. 230-2 at 146.] To the extent that document was omitted from the magistrate judge's review, this court considers the medical record request and reaches the same conclusion as the magistrate judge.

When Alston arrived at the Detention Facility in August 2022, he already wore a hearing aid because he was fully deaf in his left ear and nearly deaf in his right. [ECF No. 230-2 at 116, 120.] Following an assault in November 2022, Alston complained of pain in his left ear. [ECF. No. 271 at 12.] He was seen by medical personnel who documented Alston's complaints of pain and redness and swelling of the ear. [ECF No. 219-4 at 83.] Otherwise, those records note, "Ear canal was good just some ear wax. [Alston] stated he was okay and did not need anything further from medical." [ECF No. 219-4 at 83.][6] Alston now claims he lost hearing due to untimely treatment of his ear infections and ruptured eardrum after the assault. *See* ECF No. 271 at 16. The magistrate judge again found that Alston failed to demonstrate the required "substantial injury" resulting from delays in medical care necessary to survive summary judgment. [ECF No. 269 at 34.]

Objections Two, Three, and Four relate to Alston's injury to his ear and the treatment he received afterward. [ECF No. 271 at 12–18.] As with his other objections, Alston largely recites the facts cited in the Report then claims he "has shown through the documentation and records how ineffective the sick-call procedures are at [the Detention Center.]" *Id.* at 18. He continues, "documentation and records [] show how the delay in treatment allowed Plaintiff's pain and symptoms to exacerbate because of the delay in treatment." *Id.*

His only reference to the Report is that "Your honor points that 'detainees have no federal constitutional rights to any inmate grievance system.' Though that may be true its moot in this case." [ECF No. 271 at 15 (quoting ECF No. 269 at 52).] He claims that the requirement that all

---

[6] As with Alston's gunshot wound, the treatment for his ear injuries warrants additional summary and is contained in the table attached to this order. *See supra* app. 2.

medical requests be submitted via the Detention Facility grievance system creates a "sick-call procedure[,]" which he maintains a constitutional right to access. *See* ECF No. 271 at 16.

The court agrees with the Report's analysis. No genuine issue of material fact exists that any Defendant acted in an objectively unreasonable manner regarding Alston's ear care. *See Short*, 87 F.4th at 611 (explaining a pretrial detainee need only show "that the defendant's action or inaction was . . . objectively unreasonable").

Alston complained of ear pain in November and December 2022 and was seen twice by medical personnel. *See supra* app. 2. And on January 5, 2023, medical personnel noted Alston's ear discomfort had resolved without treatment. *Id.* In December 2023, Alston complained of pain from an ear infection. *Id.* He was examined two days after submitting a complaint and was initially given anti-inflammatories to treat his pain. *Id.* When a more serious infection was identified, he was prescribed antibiotics. *Id.* Although Alston characterizes these encounters as delay, the records show timely examinations and improvement with treatment. The court agrees with the magistrate judge that Alston fails to show how such delay caused him substantial harm. *Smith v. Walker*, 845 F. Supp. 2d 673, 677 (W.D.N.C.) ("Delay in medical care, without showing substantial harm, does not violate the [Constitution]."). This objection is overruled.

### C.  Objections Five, Eight, and Nine: Foot-Related Issues

In May 2023, Alston requested information about permissible shoes because his "bullet wound" hurt when walking. [ECF No. 219-4 at 111.][7]

The next month Alston received approval from Dr. Garman for "inserts." *Id*. at 131. Alston continued to request padded footwear through September 2023 and Nurse Sieklicki then advised

---

[7] Nurse Lawson responded on September 5, 2023, that "the only shoes available are for purchase on commissary." *Id.*

him:

> If you have someone that can bring you new insoles in the package, that is allowed. They can drop it off at the front desk, it will be checked by security and you are allowed to have this. Again they must be new and in the package. Other than that, there are some slip on shoes on the commissary list.

*Id.* at 115–30.

Soon after, Alston complained that his shoes pressed directly on the side of his bone pain. *Id.* at 127. Nurse Sieklicki responded that certain orthopedic shoes were allowed if they met certain requirements and passed a security inspection.

Nurse Sieklicki reiterated the same information via a medical encounter on September 22, 2023—"ok for inserts/ortho shoes per provider. Must pass security." *Id.* at 132. Alston subsequently had shoes delivered, but security rejected them. *Id.* at 128–30, 134–36.

Alston submitted an email he received with Defendants' discovery responses. *Id.* at 140. On October 6, 2023, Nurse Lawson emailed Captain Susan Safford, stating:

> No one in medical approved his shoes. He originally asked the provider if he could have orthotic inserts for his shoes. He was told that if they were in the original package and were approved by security then he might be able to have them. Those particular shoes showed up here. They were ordered by his family and sent in his name which I didn't think the jail would accept. They were not addressed to medical. I had Schomp look at them and he said he could not have them. Michael Jernigan called me later that day or the next day and asked me about them and why he couldn't have them, and I said, Schomp said he couldn't have them and I thought they would just cause problems as they are not medically necessary and other people will want to have their own shoes. So medical didn't approve them and neither did security that I am aware of.

*Id.*

Over the next several months, there was much back and forth over Alston's shoes, but eventually, the shoes he ordered were approved, and he received them on February 14, 2024. *Id.* at 134–39. Affidavits from Nurse Lawson and NP Petkovsek confirm that no medical provider ever prescribed orthotic shoes for Alston, but they approved them after Alston's repeated requests.

11

*See* ECF No. 230-3 at 4; ECF No. 230-6 at 1.

Alston also claims deliberate indifference concerning treatment for cracked skin on his foot.[8] [ECF No. 257 at 24.] A February 2, 2024, medical record references Alston's complaint of "edema to the top of the foot for a week." [ECF No. 230-2 at 323.] Medical personnel encouraged elevation, and within a few days Alston had "no edema" and "intact" range of motion. *Id.* at 322.

On March 17, 2024, Alston submitted a kiosk request to Defendant Lawson seeking a "stronger medical cream" than what was available "on canteen" for his "skin issues." [ECF No. 230-2 at 362.] Defendant Sieklicki responded to this request on March 19, 2024, stating:

> The medical department is here to treat serious medical needs. Dry skin is not considered a serious medical need. Your feet were assessed 2/6/24 by Nurse Practitioner and they were not bleeding or cracked. There was no sign of infection. There was nothing observed that would require any kind of medicated cream. A&D ointment is being added to the canteen list and could be an option for you.

*Id.*

The magistrate judge rejected Alston's deliberate indifference claim based on delay, finding no evidence of substantial harm and concluding that any delay was not objectively unreasonable. [ECF No. 269 at 40, 43.]

Alston's Fifth, Eighth, and Ninth objections challenge this conclusion. *See* ECF No. 271 at 18–27, 35–19. Citing the *Short* test, he argues that:

> Lawson knew Plaintiff had a medical condition that posed a risk of serious harm; Lawson intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; Lawson knew or should have known that he had the condition and that Lawson's action or inaction posed an unjustifiably high risk of harm; and as a result, Plaintiff was harmed.

---

[8] This claim is not in the Amended Complaint, but the court addresses it here out of an abundance of caution.

[ECF No. 271 at 23.][9]

His conclusory argument is unavailing. Even under his framing, Alston concedes that he must show that Lawson's actions were objectively unreasonable. *Id.* He provides no such evidence. The record and the Report both show Alston regularly communicated with medical staff regarding receiving orthopedic shoes as well as accommodations for his cracked skin. [ECF No. 269 at 22–25.] At bottom, he has failed to provide evidence that any named defendant acted below an objective standard of reasonableness. His allegations amount to disagreements with medical personnel regarding the best course for his medical care. While sincere, they fall below the constitutional threshold. *See Hardee v. Walz*, No. 3:20-cv-729, 2023 WL 5673952, at *16 (E.D. Va. Sept. 1, 2023) ("Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference."). Accordingly, these objections are overruled.

### D. Objections Seven and Thirteen: Skin Cancer and Denial of Specialist Treatment

On March 21, 2023, Alston reported to medical personnel that "two spots" on his left leg which had "been there for years" had both changed colors, which he found concerning due to a family history of skin cancer. [ECF No. 230-2 at 533.] Alston saw Nurse Rachel Brown on March 27, but failed to mention the spots. *Id.* at 28. Instead, he complained of red, itchy skin on his right

---

[9]Alston alleges that because he has provided proof he "was treated as a 'nuisance' and [Defendants] were 'insufficiently interested in his health,'" his claims should proceed. *See* ECF No. 271 at 27 (quoting *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428 (7th Cir. 1991)). He also requests that Lawson's affidavit be "struck from the case" due to several misrepresentations. [ECF No. 271 at 38.] However, even disregarding Lawson's affidavit and considering Alston's evidence in the light most favorable to him, the court still concludes that Alston's treatment was not objectively unreasonable.

arm, and was given cream to use for fourteen days and told to return to the clinic with any worsening symptoms. *Id*.

On November 1, 2023, Alston submitted a medical request asking whether medical staff could identify skin cancer for three "spots" that had changed over the last year. *Id*. at 537. NP Petkovsek examined Alston on November 9, 2023, diagnosing a skin tag on the back of his right shin and a red mole on the left back. *Id*. at 17. Petkovsek later stated, "these conditions are not medical emergencies and usually require no treatment, much less urgent treatment." *Id*. In his affidavit, Petkovsek explained he did not refer Alston to a dermatologist because he "had no concerns for skin cancer" and recommended that Alston see a dermatologist post incarceration if he still had concerns. *Id*.

Alston disagreed, and submitted a medical request complaining that medical staff dismissed his spots as "skin tags." [ECF. No. 230-2 at 184.] He further claims that after he told staff that one spot had been previously diagnosed as skin cancer, they "backpedaled and said [he] may have cancer, but the policy at [the Detention Center] is to leave it untreated and recommend [he] seek treatment upon release." *Id*.

Alston received an official, albeit delayed, response to that complaint on February 2, 2024, when Nurse Lawson advised Alston that he could request outside medical care at any time but that that he would be financially responsible for the cost of such care. *Id.* Lawson also asked for documentation regarding Alston's cancer diagnosis so that medical staff could better assist him. *Id.* Finally, Lawson assured him that if staff had misdiagnosed his "spots" as skin tags, they could be reassessed, and a revised recommendation could be made. *Id.*

On January 20, 2024, Alston was again seen for complaints of "red, itchy area lower left leg." *Id.* at 325. A new order for hydrocortisone cream was entered. *Id.* NP Petkovsek later saw

14

Alston for "multiple concerns," including skin cancer. *Id.* at 321. In his affidavit, NP Petkovsek stated he "examined the areas of concern and assured [Alston] there was no evidence of skin cancer." [ECF No. 230-6 at 1.]

The magistrate judge concluded that Defendants' treatment of Alston's skin concerns was not objectively unreasonable, and that Alston failed to demonstrate substantial harm arising from any delay in treatment. [ECF No. 269 at 38.] The magistrate judge further found that Defendants used their medical expertise in concluding Alston's skin conditions could be adequately treated at the Detention Center, eliminating the need for an outside referral. *Id.* at 48.

Alston's objects. [ECF No. 271 at 33–35.] Broadly construed, Alston reargues that Defendants erroneously dismissed his spots as "skin tags" and wrongfully denied him outside medical care for this and other issues. [ECF No. 271 at 34.] Alston also claims the Detention Center's policy requiring detainees to pre-pay for outside medical care violates his constitutional rights. [ECF No. 271 at 45–46.]

The magistrate judge considered and rejected these same arguments. [ECF No. 269 at 49–50.] The law supports that conclusion. Although pre-trial detainees have a constitutional right to receive medically necessary care, they are not entitled to the care of their choice. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 245 (1983); *Jackson v. Fair,* 846 F.2d 811, 817 (1st Cir. 1988). Here, outside care was never found medically necessary for Alston's ailments, including his alleged skin cancer, and he failed to demonstrate any genuine issue of material fact.[10] Because no necessary medical care was withheld, this objection is overruled.

---

[10] Although he is correct that a wound care consultation was approved at one time for his gunshot wound, ECF No. 230-2 at 92, this consult was found to no longer be medically necessary once his wound began to substantially heal. *See* ECF No. 230-5 ¶ 11. ("Because there were no signs of infection and no tissue necrosis, there was no longer a need for a wound care specialist."); ECF No. 230-2 at 64.

### E.  Objection Ten: Mental Health and Isolation

On August 15, 2022, Alston submitted a medical request complaining of extreme anxiety, night sweats, and a racing heart. [ECF No. 230-2 at 384.] The next week, he saw a mental health counselor, who did not recommend medication management. *Id*. at 99, 100. A month later, a Qualified Mental Health Professional ("QMHP") saw Alston and assessed his anxiety as "within normal limits of situation." *Id.* at 95. The QMHP "recommended brief therapy intervention and informed patient at this time he was not recommended for medical management." *Id.*

In October 2022, Alston told Dr. Garman that his anxiety persisted. *Id.* at 79. Dr. Garman prescribed Vistaril (an antihistamine often used for anxiety) until Alston could be seen by another mental health professional. *Id.* The next month, psychiatrist Dr. Elizabeth Leonard diagnosed Alston with depressive and anxiety disorders and prescribed mirtazapine. *Id.* at 275–76. In January 2023, Dr. Leonard adjusted the medications. *Id.* at 277–78. Then in February 2023, Alston refused a follow-up visit with Dr. Leonard, who noted he was non-compliant with morning medications. *Id.* at 279.

Alston was medically quarantined in October 2022.[11] [ECF No. 269 at 45.] He claims this worsened his anxiety and therefore violated his constitutional rights. [ECF No. 271 at 39–43.]

The magistrate judge found no violation, noting that Alston failed to produce evidence of a significant physical or emotional injury. [ECF No. 269 at 46–47.]

In his tenth objection, Alston challenges the conditions of his medical isolation. [ECF No. 271 at 39–43.] Citing the Supreme Court's opinion in *Rhodes v. Chapman*,[12] Alston argues his

---

[11] Alston was medically quarantined twice in October 2022—first from October 11th through the 14th, then again from October 25th to the 31st. *See* ECF No. 269 at 45. Although medical records indicate Alston was removed from this second medical isolation on October 29th, the court assumes a longer period of isolation in Alston's favor.

[12] *Rhodes v. Chapman*, 452 U.S. 337 (1981).

claims should proceed since he has shown conditions constituting "unnecessary and wanton infliction of pain" which are "totally without penological justification." [ECF No. 271 at 42–43.] As evidence, Alston claims that before going into medical isolation, a medical professional noted his anxiety was "within normal limits." *Id.* Afterward, a mental health professional noted he was "experiencing situational depression," and that "medication would be a helpful intervention." *Id.* This, he claims, is proof that he experienced severe mental anguish due to isolation and thus he claims should proceed. The court disagrees.

Conditions of confinement claims by pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment, which provides protections co-extensive with those of the Eighth Amendment. *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 250 (4th Cir. 2005); *see Bell v. Wolfish,* 441 U.S. 520, 535 (1979); *see also Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001) (noting that "the Fourteenth Amendment rights of pre-trial detainees 'are at least as great as the Eighth Amendment protections available to a convicted prisoner'" (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983))).

Evaluating conditions of confinement claims in the context of pretrial detainees, the Fourth Circuit applies a two-prong test, considering: (1) "whether the conditions of confinement objectively inflict harm that is sufficiently serious to deprive a prisoner of minimal civilized necessities," and (2) "whether prison officials subjectively acted with 'deliberate indifference to inmate health or safety,' meaning that they actually knew of and disregarded the inhumane nature of confinement."[13] *Sleeper v. City of Richmond, Va.*, No. 3:12CV441-HEH, 2012 WL 3555412, at 6 (E.D. Va. Aug. 16, 2012) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Roberts*

---

[13] Both parties and the magistrate judge focus the inquiry to the second prong, whether officials acted with deliberate indifference to Alston's health or safety when placing him in medical isolation. *See* ECF No. 235 at 13; ECF No. 269 at 31. The court does the same.

*v. Taniguchi*, No. CIV.A. JKB-12-1187, 2012 WL 5252288, at \*5 (D. Md. Oct. 23, 2012) (describing two-prong test). Further, a plaintiff asserting unconstitutional conditions of confinement must show that he suffered a serious or significant physical or mental injury because of the challenged condition or a substantial risk of such serious harm resulting from the plaintiff's unwilling exposure to the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Even assuming Alston meets the first two prongs, his evidence of anxiety and depression does not establish a significant injury. Courts have held that symptoms such as depression, anxiety, or mental stress fall below the threshold for conditions-of-confinement claim. *See Lopez v. Robinson*, 914 F.2d 486, 491 (4th Cir. 1990) (finding claims of "mental stress as a result of being confined in a cell that lacks adequate ventilation" to fall below the "serious medical and emotional deterioration" standard); *Field v. W. Virginia*, No. CV 2:20-00147, 2020 WL 8085176, \* (S.D.W. Va. Dec. 16, 2020) ("A depressed mental state, without more, does not rise to the level of 'serious or significant physical or emotional injury' that must be shown to withstand summary judgment[.]"). The record shows Alston received treatment, including medication, which he later discontinued on his own. He has failed to identify any genuine issue of material fact. Accordingly, his objection is overruled.

### F.  Objection Eleven: Delay in Receiving Medications

Alston raises a general objection related to the delayed treatment he received with respect to several conditions. He argues these claims of unnecessary or wanton infliction of pain are actionable under § 1983 and further asserts that a delay in treatment may constitute deliberate indifference depending on the seriousness of the condition and the ease of providing treatment. [ECF No. 271 at 43–44.] He claims that because he provided several examples of medical personnel providing immediate treatment, his claims should proceed because "nurses who choose

not to provide medical treatment are knowingly and intentionally causing [him] unnecessary pain." *Id.* Essentially, he argues that the immediate treatment he received in some instances demonstrates that any delayed treatment he received violated his constitutional rights.

But Alston's logic is flawed. Nothing in *Short* suggests that some immediate treatment requires all treatment to be immediate. Instead, the standard is whether officials "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed[.]" *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).[14] This objection is overruled.

### G. Objections Six, Twelve, and Fourteen: Ineffective Sick Call System and Delayed Treatment

Alston also objects to delays in treatment generally. The magistrate judge rejected these claims, finding no evidence of substantial harm. *See* ECF No. 269 at 51. Alston disputes this conclusion. [ECF No. 271 at 44.] He points to the following evidence in support of his objections:

- The delay in response to ear infection in December 2023 led to a ruptured tympanic membrane and further permanent loss of hearing.

- The ear infection of April 2024 resulted in an abscess that progressed to a ruptured abscess.

- The delay in providing footwear led to increased swelling in his right foot.

*Id.*

But delayed access to medical care only rises to deliberate indifference if it causes substantial harm. *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008). Alston has failed to make this showing.

---

[14] Alston claims that the Fourth Circuit's holding in *Sharpe* also supports his conclusion. In that case, the Fourth Circuit noted that "a delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732 (4th Cir. 2015) (unpublished). But it does not follow that immediate treatment is required by the constitutions for all medical needs.

### 1. Ear Infections

In December 2023, Alston reported an ear infection on December 2 and was treated with antibiotics on December 6. ECF No. 269 at 14–15. No evidence shows the four-day delay caused substantial harm. *See Smith*, 845 F. Supp. 2d at 677.

Similarly, in March 2024, Alston developed another ear infection, was seen on April 2, and was prescribed antibiotics. *Id.* at 17. Again, no substantial harm is shown.

### 2. Orthopedic Shoes

The record does not indicate that any medical provider prescribed Alston orthopedic inserts or special shoes as treatment for a medical condition. Delays appear to have been based on security concerns. [ECF No. 219-4 at 136; ECF No. 230-3 at 4.] Alston has not shown substantial harm. At most, the record suggests negligence, which is not deliberate indifference. *Short*, 87 F.4th at 611–12.

### 3. Spider Bite

Alston claims he was bitten on the nose by a venomous spider while in medical isolation on October 12, 2022. [ECF No. 219-1 at 4–5.] Four days later, Nurse Rachel Brown examined Alston and prescribed him an antibiotic for ten days due to a "red swollen nose." [ECF No. 230-2 at 77.] He claims medical personnel denied him pain medication and that follow-up did not occur. [ECF No. 1 at 70–71.] But he has not shown substantial harm, and thus this claim also fails.

### 4. Lump

On February 17, 2024, Alston reported pain under his left nipple. [ECF No. 230-2 at 349.] He claimed the pain started January 27, 2024, but he initially thought it was possibly caused by "sleeping on it wrong." *Id.* Alston was examined by medical personnel on February 19, 2024, who conferred with NP Petkovsek. *Id.* at 318. NP Petkovsek, suspecting a pulled muscle, ordered

ibuprofen. *Id.*

On February 23, 2024, Alston submitted another medical request where he mentioned a "lump," found "last night," which was partly under his nipple and below. *Id.* at 347. On March 4, 2024, NP Petkovsek diagnosed a lipoma and ordered an ultrasound. *See* ECF. No. 230-6 at 2; ECF. No. 230-2 at 317. The ultrasound revealed no masses or fluid. [ECF No. 230-2 at 284.] Because Alston continued to feel pain from the lump, he was given ibuprofen. *Id*. at 316.

Alston saw NP Petkovsek again on April 2, 2024, and continued to complain of pain and was prescribed amitriptyline. ECF No. 131 at 70; *see also* ECF No. 230-2 at 329. Alston confirms that he still has a painful lump. [ECF No. 271 at 33.]

The magistrate judge concluded that Defendants' treatment of Alston's lump was not objectively unreasonable and that he failed to demonstrate substantial harm arising from any delay in treatment. [ECF No. 269 at 37.]

Alston objects to that conclusion. *Id.* at 27–33. But the record confirms that he received repeated examinations and diagnostic testing within a short period. *See* ECF No. 269 at 36–37. Alston fails to evidence how, during this one-month timeframe, any delays in treatment were objectively unreasonable or caused him substantial harm sufficient to satisfy the requirements for his constitutional claims. Accordingly, this objection is overruled.

## V.    Conclusion

After a thorough review of the Report, the applicable law, and the record of this case, the court finds no clear error in the Report. Additionally, the court reviewed de novo the parts of the Report to which Alston objected. The court hereby **ADOPTS** the Report and Recommendation, ECF No. 269. As a result, Defendants' motion for summary judgment, ECF No. 230 is **GRANTED**. Alston's constitutional claims fail as a matter of law and are therefore dismissed

**WITH PREJUDICE**. For these same reasons, Alston's motion for partial summary judgment, ECF No. 219, is **DENIED**.

Because the court grants Defendants' motion for summary judgment, the court **TERMINATES AS MOOT** the magistrate judge's Report and Recommendation, ECF No. 268, regarding Defendants' motion for judgment under 54(b), ECF No. 236. That motion is also **TERMINATED AS MOOT** since all of Alston's claims are dismissed under Rule 56(a).

**IT IS SO ORDERED.**

August 25, 2025
Columbia, South Carolina

Sherri A. Lydon
United States District Judge

*Appendix 1: Treatment for Gunshot Wound*

| Date | Relevant Information: |
|------|----------------------|
| July 21, 2022<br><br>ECF No. 230-2 at 114–18. | Alston arrives at the Detention Center with an open gunshot wound to his left ankle. Nurse Rachel Brown changed the dressing over the wound, cleaned it, and covered it with gauze. |
| July 27, 2022<br><br>ECF No. 230-2 at 109–11. | Alston was examined by Defendant NP Schinitra Swinney. During this examination, Alston rated his pain as 8/10, describing it as "pulsing." His vital signs were stable, with no signs of fever. NP Swinney examined the wound, which was beefy and dark red. There was no odor or drainage, but the edges were concerning for early necrosis (tissue death), so NP Swinney recommended a "wound care consult" to ensure against tissue loss. |
| August 3, 2022<br><br>ECF No. 230-2 at 108. | Defendant Nurse Kelsey Ledford redressed Alston's wound, noting no infection. |
| August 12, 2022<br><br>ECF No. 230-2 at 107. | Defendant Nurse Danielle Winns cleaned and redressed Alston's wound. |
| August 13, 2022<br><br>ECF No. 230-2 at 126. | Alston submitted a medical request seeking a left footrest for his wheelchair. He claimed, "improper bandage material got caught in the wheel again and ran over [his] foot." |
| August 17, 2022<br><br>ECF No. 230-2 at 103 | NP Swinney examined Alston. NP Swinney noted the wound's dimensions had not changed from her prior examination. She also noted, "wound bed red, edges concern for early necrosis, moderate drainage," documented ongoing efforts to schedule a wound care consult, and prescribed amitriptyline (a nerve pain medication) for thirty days. *Id.*; ECF No. 230-5 at 2. |
| September 14, 2022<br>ECF No. 230-2 at 92. | NP Swinney reassessed Alston. She documented that the dimensions of Alston's "non healing wound" had not changed since her last examination, and she also noted, "wound bed red with yellow tissue present, moderate drainage, dry flakey skin present to bilateral plantar aspect of both feet, left worse than right." She prescribed a topical to apply "to affected areas of dry skin" for thirty days. |
| September 16, 2022<br><br>ECF No. 230-5 at 3. | Dr. Steve Garman examined Alston and noted "the wound is healing nicely without evidence of infection" or "inflammation." Dr. Garman further noted "marginal granulation," which he describes in his affidavit as "new tissue and blood vessels forming in the wound bed." [ECF. No. 230-4 at 2.] Dr. Garman advised Alston to continue cleansing the wound daily with soap and water, and he ordered dressing changes be continued. His notes also state, "No ointment. Weight bearing with walker as tolerated." Dr. Garman notes "some concern about referral for wound management." *Id.* |
| September 27, 2022 | NP Swinney again examined Alston. Her notes state, "Did not remove dressing, per patient request. No drainage noted . . . [w]ill have walker for ambulation." She noted the plan to |

| ECF No. 230-2 at 86. | continue cleansing the wound daily with soap and water along with dressing changes. In her affidavit, NP Swinney claims that during this examination, "there were no signs or symptoms of infection[,]" and there "were no longer signs of tissue necrosis on the edges or anywhere. There was a scant amount of green drainage and [she] advised [Alston] to continue wound care." [ECF No. 230-5 at 3.] |
|---|---|
| September 30, 2022<br><br>ECF No. 230-2 at 85 | Dr. Garman examined Alston, noting "Pleasant male in no distress. He ambulates with a walker. There is granulation tissue with wound margin healing but some erythema with some purulence. Heel is swollen and tender to light touch." In his affidavit, Dr. Garman claims that at this visit:<br><br>    [T]he heel had become swollen with dark drainage, purulence (pus), and increased pain with weight bearing. I attributed the decline to the patient's recent transition from using a wheelchair (non-weight bearing) to ambulating with a walker (weightbearing), which could have impacted the circulation and healing process. I ordered an antibiotic and continued daily wet/dry dressings. I also ordered bloodwork to rule out any systemic infection, and an x-ray to rule out fractures. As well, I increased the dosage of the Amitriptyline for neuropathic pain.<br><br>    [ECF No. 230-4 ¶ 7.] |
| October 4, 2022.<br><br>ECF No. 230-2 at 328. | Alston's blood tests reveal a white blood cell count within normal limits. Dr. Garman claims these results assured him Alston did not have an infection and that antibiotics were the appropriate treatment. [ECF No. 230-4 at 2.]<br><br>He further claimed that based on his assessments of the wound and expertise, he did not believe Alston needed care from an outside wound specialist. *See id.* at 3. |
| October 10, 2022.<br><br>ECF No. 230-2 at 81. | Defendant NP Sally Blake examined Alston after he complained of pain in his left heel. Alston noted the swelling had decreased "markedly since the wound was infected" and that Alston was "unable to move 4th and 5th toe[.]" NP Blake measured the wound, which had decreased in size from the initial measurements, and scheduled a follow-up appointment with Dr. Garman. |
| October 13, 2022<br><br>ECF No. 219-4 at 67 | Dr. Garman examined Alston, who had complained of being "moved into a cell with others with wound infections." Dr. Garman noted that "the open wound to the inner left ankle has no evidence of infection," and stated, "I see no reason to isolate him and recommend he be free to move around with general jail population." In his declaration, Alston states he was "removed from quarantine" the next day. ECF No. 219-1 at 4; ECF No. 131 at 3. |
| November 10, 2022<br><br>ECF No. 230-2 at 64 | Alston was examined by another physician who reported the gunshot wound had improved over time and was "healing well." Specific to his wound, the notes for this visit document:<br><br>[G]ood granulation tissue covering the entire wound, slightly extending out, some dead tissue surrounding the wound, skin around it normal color, no warmth, no discharge, nor redness, not foul smelling . . . good granulation tissue covering the entire wound. |

*Appendix 2: Treatment for Ear Injuries*

| Date: | Relevant Information: |
|---|---|
| November 20, 2022<br><br>ECF. No. 219-4 at 85. | Alston complained his "ear is extremely painful to touch from last weekend's assault." The response to this request states, "Placed on sick call list." |
| December 2, 2022<br><br>ECF. No. 219-4 at 87. | Alston again complained of pain in his ear "from an assault that happened 4 weeks ago." |
| January 5, 2023<br><br>ECF No. 219-4 at 93 | Alston met with a physician, reporting "his left ear discomfort has improved and he has chronic hearing loss—which is unchanged on the left" he also reported "partial hearing loss of the right as well." |
| December 3, 2023<br><br>ECF No. 131 at 36. | Alston alleges Defendant Rachel Brown refused to provide him Tylenol for his ear pain and "said to put it on kiosk again." |
| December 4, 2023<br><br>ECF No. 131 at 397 | Alston submitted a medical request stating he has only "one functional ear and it only has about 30 percent hearing without aid. It currently has an extremely painful infection. My ENT Dr. McKracken has warned me of ear infections damaging what little hearing I have left." |
| December 5, 2023<br><br>ECF No. 131 at 37, 69. | Alston complained of "yellow fluid and pain down to [his] jaw."<br><br>Alston claims medical personnel told him his "ear was not ruptured and probably just leaked around, and they would try to see [him] on [December 6]." He alleges that Nurse Rachel took his vitals that same day, gave him ibuprofen for the pain, and said he would be seen "first thing in the morning." [ECF No. 230-2 at 15.] |
| December 6, 2023<br><br>ECF No. 230-2 at 13. | NP Petkovsek saw Alston for his complaints of right ear pain, difficulty hearing for a few days, and left ear hearing loss.<br><br>NP Petkovsek claims that he "initially observed redness and swelling to the right eustachian tube, and a questionable ruptured tympanic membrane. To ensure a thorough examination, [he] viewed the ear a second time and concluded that the tympanic membrane was ruptured." [ECF No. 230-6 at 2.] He prescribed antibiotics that day. *Id.* |
| December 19, 2023<br><br>ECF No. 230-2 at 9. | Dr. Garman saw Alston in a follow up. Alston reported that "since right ear infection, he has less hearing, even with his hearing aid." But reported no ear pain.<br><br>Dr. Garman examined Alston's right ear and observed a clear canal and a healed tympanic membrane. *Id.* Dr. Garman's affidavit and the medical record state there was flaky debris on the membrane and in the canal suggestive of a fungal infection. *Id.*; ECF No. 230-4 at 3. Dr. Garman prescribed ear drops and Flonase. [ECF No. 230-2 at 9.] Dr. Garman claims that during this appointment, Alston "questioned whether the ear infection had exacerbated his pre-existing hearing loss." [ECF No. 230-4 at 3.] |

25

| | |
|---|---|
| | Dr. Garman explained that he had no concerns about the ear infection exacerbating the hearing loss and advised Alston that an ear, nose, and throat specialist could assess the status of the hearing loss, and that he could coordinate care post-incarceration or ask his family to do so during incarceration. *Id.* at 3–4. According to Dr. Garman, "there was no urgent need for a [] referral, and [he] did not order one." *Id.* at 4. |
| December 19, 2023<br><br>ECF No. 230-2 at 191; *see also* ECF No. 131 at 69. | Alston submitted a medical request stating:<br><br>Dr. Garman confirmed that he cannot determine the extent of the damage done to my ear . . . and said I need an ear nose and throat Dr to truly determine the extent of damage . . . He prescribed a fungal drop for my ears and flonase. When will those start? |
| December 27, 2023<br><br>ECF No. 230-2 at 192 | Alston submitted a medical request stating that the Flonase was helping to clear his sinuses and asking to "stay on it." He complained that his "hearing has not improved [] with the ear drops" and asked for "the next option." |
| January 2, 2024<br><br>ECF No. 230-2 at 193. | Alston submitted a medical request stating he was "still waiting to hear a response as to the next option for trying to fix the damage to [his] hearing due to Mediko providing poor and untimely medical care which allowed an ear infection to get so bad it ruptured." |
| February 2, 2024<br><br>ECF No. 230-2 at 192 | Nurse Lawson approved Alston's continued use of Flonase stating, "There has been no provider order for an outside ENT visit. . . . If you or your family can arrange payment for an outside ENT visit, we will do our part to arrange transport." |
| March 28, 2024<br><br>ECF No. 131 at 69 | Alston alleges he "developed an infection on [his] inner ear lobe," and he "began showing nurses and documenting on the kiosk immediately." |
| April 2, 2024<br><br>ECF No. 230-2 at 329. | Alston submitted a medical request stating he met with medical personnel who examined his "ear lobe and inner ear" and "confirmed the infection and prescribed anti-biotics to take care of both."<br><br>Alston's medical record shows an order was placed for him to receive antibiotics two times per day from April 2, 2024, through April 9, 2024, and he received this medication during this time. *Id.* at 288–90. |
| July 24, 2024<br><br>ECF No. 230-2 at 478, 480, 482, 483. | Alston was hospitalized for a noncancerous tumor. An ENT who consulted Alston noted "decreased hearing on right [ear] since December when he had [active otitis media] and [tympanic membrane] rupture." Alston reported that he wore a hearing aid and "does well" with it. Upon examination, the ENT noted crusting to the tympanic membrane but no "visible perforation, no effusion, no drainage." The ENT did not recommend any treatment related to Alston's right ear and/or hearing loss. |